TODD KIM
Assistant Attorney General
JAY GOVINDAN, Section Chief
BONNIE M. BALLARD
Trial Attorney
U.S. Department of Justice
Environment & Natural Resources Division
Wildlife & Marine Resources Section
Ben Franklin Station
P.O. Box 7611
Washington, DC 20044-7611
(202) 305-1513
Bonnie.M.Ballard@usdoj.gov

*Attorneys for Federal Defendant*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

|  |  |
|---|---|
| STATE OF ALASKA and NORTH SLOPE BOROUGH,<br><br>    Plaintiffs,<br><br>    vs.<br><br>NATIONAL MARINE FISHERIES SERVICE,<br><br>    Federal Defendant. | Case. No. 3:22-cv-00249-JMK<br><br><br>**FEDERAL DEFENDANT'S COMBINED BRIEF IN OPPOSITION PURSUANT TO LOCAL RULE 16.3(c)(2)** |

# TABLE OF CONTENTS

**Page(s)**

INTRODUCTION ....................................................................................... 1

BACKGROUND ........................................................................................ 2

   I.   Statutory Background ........................................................................ 2

   II.   Factual and Procedural Background ................................................. 5

      A.  Final Listing Rule for the Arctic Ringed Seal ........................... 5

      B.  Challenges to Arctic Ringed Seal Listing Rule ......................... 7

      C.  Plaintiffs' Petition and 90-day Finding ................................... 9

STANDARD OF REVIEW ....................................................................... 11

ARGUMENT ........................................................................................... 12

   I.   Plaintiffs' Petition did not provide substantial scientific or commercial information such that the petitioned action may be warranted. ................................................... 12

      A.  FWS's not warranted listing decision for the Pacific walrus does not conflict with NMFS's Listing Rule for the Arctic Ringed Seal. ...................................... 14

      B.  Data from IPCC's AR5 presented in Plaintiffs' Petition do not constitute substantial new information not previously considered. .................................... 15

i.    The difference in emissions scenarios in AR5 account for any substantial difference in climate projections from AR4. .................................................... 16

ii.    No reasonable scientist would credit RCP 2.6 as an emissions scenario likely to occur. .................................................................................................. 18

iii.    AR4 and AR5 reach the same conclusions. .................................................. 20

C.    Plaintiffs' Petition does not present new substantial information regarding on-ice snow cover. ........................................................................................... 23

D.    Plaintiffs' Petition does not provide new substantial information regarding population size and resiliency to habitat change. ................................................. 24

II.    Plaintiffs' brief largely recycles arguments previously rejected by the Ninth Circuit. ............................................................................................................ 26

III.    NMFS applied the correct standard in its review of Plaintiffs' Petition to Delist. 27

IV.    No remedy is necessary and Plaintiffs' request that the Court direct NMFS to issue a positive 90-day finding is not appropriate. ................................................. 28

CONCLUSION ............................................................................................................. 30

# TABLE OF AUTHORITIES

**Case**                                                                                      **Page(s)**

*Air Cargo v. U.S. Postal Serv.*,
   674 F.3d 852, 400 U.S. App. D.C. 69 (D.C. Cir. 2012) ................................................ 28

*Alaska Oil and Gas Association v. Jewell*,
   815 F.3d 544 (9th Cir. 2016) ............................................................ 8, 11, 26, 27

*Alaska Oil & Gas Ass'n v. Pritzker*,
   840 F.3d 671 (9th Cir. 2016) ................................................................. 8, 9, 26

*Alaska Oil & Gas Ass'n v. Nat'l Marine Fisheries Serv.*,
   No. 4:14-cv-00029-RRB, 2016 U.S. Dist. LEXIS 34848 (D. Alaska, Mar. 17, 2016) ... 7

*Alaska Oil & Gas Ass'n v. Ross*,
   722 Fed. App'x 666 (9th Cir. 2018) ..................................................... passim

*Ariz. Cattle Growers' Ass'n v. Salazar*,
   606 F.3d 1160 (9th Cir. 2010) ....................................................................... 11

*Buffalo Field Campaign v. Zinke*,
   289 F. Supp. 3d 103 (D.D.C. 2018) ........................................................ 13, 28

*Campaign v. Williams*,
   579 F. Supp. 3d 186 (D.D.C. 2022) ................................................... 27, 29, 30

*Citizens to Pres. Overton Park, Inc. v. Volpe*,
   401 U.S. 402 (1971) ...................................................................................... 11

*Defs. of Wildlife v. USFWS*,
   584 F. Supp. 3d 812 (N.D. Cal. 2022) .......................................... 23, 24, 25

*Fla. Power & Light Co. v. Lorion*,
   470 U.S. 729, 105 S. Ct. 1598, 84 L. Ed. 2d 643 (1985) .............................. 28

*Forest Guardians v. U.S. Forest Serv.*,
   329 F.3d 1089 (9th Cir. 2003) ..................................................................... 12

*In re Polar Bear ESA Listing*,
   709 F.3d 1 (D.C. Cir. 2013) ................................................................. 8, 26

*In re Polar Bear ESA Listing,*
    794 F. Supp. 2d 65 (D.D.C. 2011) ........................................................... 8

*Lands Council v. McNair,*
    537 F.3d 981 (9th Cir. 2008) ............................................................... 12

*Marsh v. Or. Nat. Res. Council,*
    490 U.S. 360 (1989) ............................................................................ 12

*Nw. Ecosystem All. v. USFWS,*
    475 F.3d 1136 (9th Cir. 2007) ............................................................. 11

*Palouse Prairie Found. v. Salazar,*
    383 F. App'x 669 (9th Cir. 2010) ........................................................ 27

*Trout Unlimited v. Lohn,*
    559 F.3d 946 (9th Cir. 2009) ............................................................... 11

*Wildearth Guardians v. U.S. Sec'y of the Interior,*
    No. 4:08-cv-00508-EJL-LMB, 2011 U.S. Dist. LEXIS 38736 (D. Idaho Feb. 11, 2011)
    .............................................................................................................. 13

Statutes

5 U.S.C. § 706(2)(A) ................................................................................... 11

16 U.S.C. § 1531 ........................................................................................... 2

16 U.S.C. § 1531(b) ...................................................................................... 2

16 U.S.C. § 1532(6) ...................................................................................... 2

16 U.S.C. § 1532(15) .................................................................................... 2

16 U.S.C. § 1532(20) .............................................................................. 2, 25

16 U.S.C. § 1533(a)(1) ................................................................................. 2

16 U.S.C. § 1533(a)(2) ................................................................................. 2

16 U.S.C. § 1533(b)(1)(A) ............................................................................ 2

16 U.S.C. § 1533(b)(3)(A)..................................................................................................3, 12, 29

16 U.S.C. § 1533(b)(3)(B)(i)-(iii)..................................................................................................5

16 U.S.C. 1533(b)(3)(C)(ii)..................................................................................................4

Regulations

50 C.F.R. § 424.14(d)..................................................................................................4

50 C.F.R. § 424.14(h)..................................................................................................3, 12

50 C.F.R. § 424.14(h)(1)(i)..................................................................................................3, 4, 12

50 C.F.R. § 424.14(h)(1)(ii)..................................................................................................4

50 C.F.R. § 424.14(h)(1)(iii)..................................................................................................4, 12

50 C.F.R. § 424.14(h)(1)(i)-(iii)..................................................................................................13

# INTRODUCTION

This case represents an attempt by Plaintiffs to skirt settled Ninth Circuit caselaw in order to require the National Marine Fisheries Service ("NMFS") to delist the Arctic subspecies of ringed seal ("Arctic ringed seal") under the Endangered Species Act ("ESA"). In 2012, NMFS conducted a thorough review of the best scientific information available and determined that threats to ringed seals associated with habitat loss due to climate change were foreseeable by the end of the century. Despite a Ninth Circuit decision in 2018 upholding this determination, Plaintiffs submitted a Petition to Delist the ringed seal only a year later, alleging there is new information suggesting that the threats NMFS identified as likely to occur close to 2100 are no longer likely to occur, with arguments that are largely redundant of those rejected by the Ninth Circuit. Plaintiffs attempt to disguise these recycled arguments as "new information not previously considered" by failing to contextualize information presented, mischaracterizing methodology and climate projections from cited studies, and making altogether unsupported assertions. As demonstrated below, NMFS thoroughly considered all information presented in Plaintiffs' Petition, applied the appropriate standard for the 90-day finding stage, and reasonably concluded that Plaintiffs' Petition did not present substantial scientific or commercial information that indicates delisting the Arctic ringed seal may be warranted. Accordingly, the Court should reject Plaintiffs' arguments and uphold NMFS's 90-day Finding.

# BACKGROUND

## I. Statutory Background

The ESA, 16 U.S.C. § 1531, *et seq.*, was enacted to "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species and threatened species." *Id.* § 1531(b). An endangered species is "any species which is in danger of extinction throughout all or a significant portion of its range," *id.* § 1532(6), while a threatened species is "any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range," *id.* § 1532(20). NMFS[1] considers five factors when determining whether a species is endangered or threatened: "(A) the present or threatened destruction, modification, or curtailment of its habitat or range; (B) overutilization for commercial, recreational, scientific, or educational purposes; (C) disease or predation; (D) the inadequacy of existing regulatory mechanisms; or (E) other natural or manmade factors affecting its continued existence." *Id.* § 1533(a)(1). NMFS makes listing determinations "solely on the basis of the best scientific and commercial data available . . . after conducting a review of the status of the species and after taking into account those efforts, if any, being made by any State or foreign nation . . . to protect such species." *Id.* § 1533(b)(1)(A).

---

[1] NMFS is responsible for implementing the ESA for marine species including the Arctic ringed seal, while FWS is responsible for terrestrial species. 16 U.S.C. §§ 1532(15), 1533(a)(2). Together NMFS and FWS are referred to as "the Services."

A species may be listed as "endangered" or "threatened" under the ESA through the "candidate process," or as a result of a petition submitted by an "interested person." *Id.* § 1533(b)(3)(A). Specifically, as to the petition process, ESA Section 4(b)(3)(A) states that within 90 days, "[t]o the maximum extent practicable," after receiving a petition "to add a species to, or to remove a species from" the ESA's lists of threatened and endangered species, NMFS "shall make a finding as to whether the petition presents substantial scientific or commercial information indicating that the petitioned action may be warranted." *Id.* § 1533(b)(3)(A); 50 C.F.R. § 424.14(h). This is commonly referred to as the "90-day finding."

The governing regulations define "substantial scientific or commercial information" as "credible scientific or commercial information in support of the petition's claims such that a reasonable person conducting an impartial scientific review would conclude that the action proposed in the petition may be warranted." 50 C.F.R. § 424.14(h)(1)(i). The "substantial scientific or commercial information" finding "depend[s] in part on the degree to which the petition includes the following types of information: (1) [i]nformation on current population status and trends and estimates of current population sizes and distributions, both in captivity and the wild, if available; (2) [i]dentification of the [listing] factors . . . that may affect the species and where these factors are acting upon the species; (3) [w]hether and to what extent any or all of the [listing] factors alone or in combination . . . may cause the species to be an endangered species or threatened species . . . and, if so, how high in magnitude and how imminent the

threats to the species and its habitat are; (4) [i]nformation on adequacy of regulatory protections and effectiveness of conservation activities by States as well as other parties, that have been initiated or that are ongoing, that may protect the species or its habitat; and (5) [a] complete, balanced representation of the relevant facts, including information that may contradict claims in the petition." *Id.* § 424.14(d). "In reaching the initial finding on the petition . . . [t]he Services may also consider information readily available at the time the determination is made." *Id.* § 424.14(h)(1)(ii).

Importantly, "[t]he 'substantial scientific or commercial information' standard must be applied in light of any prior reviews or findings the Services have made on the listing status of the species." *Id.* § 424.14(h)(1)(iii). Thus, when NMFS has conducted a prior review that "resulted in a final agency action, a petitioned action generally would not be considered to present substantial scientific and commercial information indicating that the action may be warranted unless the petition provides new information not previously considered." *Id.*

If NMFS determines that a petition does not present "substantial scientific or commercial information indicating that the petitioned action may be warranted," NMFS will make a "negative" 90-day finding, and the process for that petition is terminated and the finding is subject to judicial review. 16 U.S.C. § 1533(b)(3)(C)(ii). If NMFS instead determines that a petition does present substantial scientific or commercial information indicating that the petitioned action may be warranted – a "positive" 90-day finding – then the agency begins a status review of the species, and within 12 months of receiving a

petition that is found to present substantial information, must determine whether the petitioned action is warranted, not warranted, or warranted but precluded (a "12-month finding"). *Id.* § 1533(b)(3)(B)(i)-(iii).

## II.     Factual and Procedural Background

### A.  Final Listing Rule for the Arctic Ringed Seal

Arctic ringed seals range throughout the Arctic Basin and southward into adjacent seas, including Hudson Bay and Baffin Bay; the Labrador, Greenland, Barents, White, Kara, Laptev, East Siberian, Bering, Chukchi, and Beaufort Seas; and waters of the Canadian Arctic Archipelago. REF00023, Fig. 2. When they are not in water, the seals are found almost exclusively on sea ice throughout most of their range. REF00024. They use sea ice for resting, pupping, nursing young, and molting. REF00027-29. Ringed seals also require adequate snow accumulation on sea ice to build birth lairs, which are critical to the protection of seal pups from hypothermia and potential predators. REF00012.

Climate change is expected to dramatically alter the availability of sea ice and thus the accumulation of snow on sea ice. NMFS00039 ("Listing Rule"). NMFS concluded in its Listing Rule that while Arctic ringed seals are believed to number in the millions range-wide, it is likely that the number of Arctic ringed seals will decline substantially in the foreseeable future, and they will no longer persist in substantial portions of their range. *Id.* This is due to the substantial projected decrease of both sea ice habitat and on-ice snow cover throughout the species' range by the end of the century. *Id.*

In accordance with these projections and additional findings from the Status Review, NMFS listed the Arctic ringed seal as threatened in late 2012. NMFS00029. NMFS explained in its Listing Rule that according to model projections, there will be continued warming in the foreseeable future, which will result in substantial reductions in sea ice and in the depths and duration of snow cover on the ice throughout the 21st century. *Id.* By 2100, snow depths adequate for the formation and occupation of birth lairs are projected to occur in only a small portion of the central Arctic, and a few small, isolated areas in other regions. NMFS00034; NMFS00174. "The projected decrease in sea ice, snow cover, and thermal capacity of birthing lairs will likely lead to decreased pup survival," as studies have shown that break-up of sea ice and insufficient snow accumulation "negatively impact[] the growth, condition, and survival of nursing ringed seal pups," with a nearly 100% mortality rate when lack of snow cover forces birthing to occur in the open. NMFS00039; REF00102. Ringed seals' high fidelity to birthing sites also makes them "more susceptible to localized degradation of snow cover." REF00102. Moreover, the rate at which ice and snow conditions are changing is rapid relative to ringed seal generation time, which considerably limits their ability to adapt to these changes behaviorally or through natural selection. REF00119.

While some public comments on the proposed rule to list the Arctic ringed seal expressed the view that "climate model predictions should not be considered beyond mid-century because they rely on assumptions about future policy decisions that will affect [greenhouse gas] emissions and are thus highly speculative," NMFS ensured that the

climate models it used constituted the best available science and accounted for any uncertainty in future projections. NMFS00045. NMFS agreed with commenters that the magnitude of the projected warming beyond mid-century is dependent on the assumed emissions scenario, but clarified that "projections of air temperatures consistently indicate that warming will continue throughout the century" and that "there is relatively little uncertainty that warming will continue," as the trend is "clear and unidirectional." *Id*.

In sum, NMFS concluded that because a projected loss of sea ice and on-ice snow cover will likely lead to substantial population decline, it is likely that Arctic ringed seals will become endangered within the foreseeable future and therefore should be listed as threatened. NMFS00039.

## B. Challenges to Arctic Ringed Seal Listing Rule

In 2014, two groups of Plaintiffs – including Plaintiffs in this case – challenged NMFS's Listing Rule for the Arctic ringed seal. *See Alaska Oil & Gas Ass'n v. Nat'l Marine Fisheries Serv.*, No. 4:14-cv-00029-RRB, 2016 U.S. Dist. LEXIS 34848 (D. Alaska, Mar. 17, 2016), *rev'd sub nom. Alaska Oil & Gas Ass'n v. Ross*, 722 Fed. App'x 666 (9th Cir. 2018) ("*AOGA II*"). Plaintiffs in *AOGA II* argued that the climate modeling used in NMFS's Listing Rule, which was based on modeling from the International Panel on Climate Change ("IPCC's") Fourth Assessment Report ("AR4"), was too speculative in its projections beyond 2050 and thus the listing was arbitrary and capricious. *Id.* at *29. While the District Court ruled in favor of Plaintiffs in *AOGA II*, the Ninth Circuit

reversed, stating that a court "cannot require the agency to 'wait until it ha[s] quantitative data reflecting the species' decline, its population tipping point, and the exact year in which that tipping point would occur before it could adopt conservation policies to prevent that species' decline.'" 722 Fed. App'x at 668 (quoting *Alaska Oil & Gas Ass'n v. Pritzker*, 840 F.3d 671, 683 (9th Cir. 2016) ("*AOGA I*")).

The court in *AOGA II* heavily relied on the Ninth Circuit's reasoning in *AOGA I*, which was a similar challenge – again, brought in part by Plaintiffs in this case – to NMFS's final rule listing the Beringia distinct population segment ("DPS") of the bearded seal as threatened on the basis that NMFS's use of IPCC climate modeling was too speculative and thus arbitrary and capricious. *AOGA II*, 722 Fed. App'x at 668; *AOGA I,* 840 F.3d at 683. In *AOGA I*, the court flatly rejected Plaintiffs' arguments, emphasizing the Ninth Circuit's recent adoption of the D.C. Circuit's holding that "the IPCC climate models constituted the 'best available science' and reasonably supported the determination that a species reliant on sea ice likely would become endangered in the foreseeable future." 840 F.3d at 679 (citing *Alaska Oil and Gas Ass'n v. Jewell*, 815 F.3d 544, 558-59 (9th Cir. 2016); *In re Polar Bear ESA Listing,* 794 F. Supp. 2d 65, 114 (D.D.C. 2011), *aff'd* 709 F.3d 1, 404 U.S. App. D.C. 171 (D.C. Cir. 2013)). Moreover, the court explained that it "must defer to the agency's interpretation of complex scientific data so long as the agency provides a reasonable explanation for adopting its approach and discloses the limitations of that approach." *Id.* (internal quotation marks omitted). The court concluded that because "the ESA does not require NMFS to make listing

decisions only if underlying research is ironclad and absolute" and that NMFS "provided a reasonable and scientifically supported methodology for addressing volatility in its long-term climate projections," NMFS's listing decision for the Beringia DPS of the bearded seal was not arbitrary or capricious. *Id.* at 680.

Accordingly, the court in *AOGA II* held that "NMFS's finding—that the Arctic ringed seal was likely to become endangered within the foreseeable future—was reasonable and supported by the record. Like the bearded seals in *AOGA I*, climate change models show the habitat of the Arctic ringed seals to be diminishing as sea ice recedes." 722 Fed. App'x at 668. Thus, the decision to list the Arctic ringed seal as threatened was "supported by the record and was not speculative." *Id.* at 669.

### C. Plaintiffs' Petition and 90-day Finding

A little over a year after the Ninth Circuit issued its opinion in *AOGA II*, a group of petitioners, including Plaintiffs here, submitted a petition to delist the Arctic ringed seal to NMFS. NMFS00104 ("Petition"). In their Petition, Plaintiffs offer five arguments in support of delisting: that (1) the U.S. Fish and Wildlife Service's (FWS) decision not to list the Pacific walrus under the ESA provided a new, conflicting analysis of what constitutes the "foreseeable future;" (2) the IPCC's Fifth Assessment Report ("AR5") includes new information demonstrating that climate model projections diverge considerably beyond mid-century; (3) new information demonstrates that the 2012 listing decision overestimated the magnitude of future declines in snow cover; (4) new biological information demonstrates the Arctic ringed seal population remains abundant

and healthy and that ringed seals have greater resilience to environmental changes than was assumed in the 2012 listing decision; and (5) new information demonstrates that international and domestic policy commitments will result in the stabilization and decrease of greenhouse gas ("GHG") emissions. *See Id.*

In its 90-day Finding on the Petition to Delist, NMFS addressed each of these respective arguments. NMFS explained that (1) FWS's listing decision for the Pacific walrus reaches the same conclusions regarding climate projections beyond mid-century as the Listing Rule for the ringed seal and thus the two rules do not conflict, NMFS00174; (2) the divergence in climate projections beyond mid-century described in AR5 was previously considered and incorporated into the Listing Rule for the ringed seal, NMFS00173; (3) the studies cited in support of Plaintiffs' assertions regarding snow cover projections addressed snow accumulation on land, rather than snow accumulation on sea ice, and thus the studies in the Petition do not contain relevant data for assessing projected changes in ringed seal habitat, NMFS00174; (4) new biological information regarding population numbers and responses to changes in habitat presented in the Petition was "consistent with the information considered in [NMFS's] listing determination for this species," NMFS00172; and (5) the Petition's assertion that new information demonstrates policy commitments will results in the reduction of GHG emissions is not supported by the cited studies, NMFS00173; NMFS00177.

In accordance with these responses, the 90-day Finding concluded that the Petition "largely reiterates previous arguments expressed in comments received regarding the

proposed listing determination for the Arctic ringed seal that were addressed in the final listing rule" and that "the petition does not present substantial new information or new analysis indicating that the scientific and commercial data considered in [NMFS's] listing determination, or the analytic methodology used in the determination, were in error." NMFS00178 ("90-day Finding").

## STANDARD OF REVIEW

Challenges to 90-day findings are reviewed under the arbitrary and capricious standard set forth in the Administrative Procedure Act ("APA"), which requires courts to uphold agency actions unless they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Ariz. Cattle Growers' Ass'n v. Salazar*, 606 F.3d 1160, 1163 (9th Cir. 2010); *see also* 5 U.S.C. § 706(2)(A). "The standard is deferential and narrow, establishing a 'high threshold' for setting aside agency action." *Jewell*, 815 F.3d at 554 (citation omitted). A court "is not empowered to substitute its judgment for that of the agency." *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971). Rather, a court "should defer to the agency's expertise" and uphold an agency action so long as the agency "considered the relevant factors and articulated a rational connection between the facts found and the choices made." *Jewell*, 815 F.3d at 554 (citing *Nw. Ecosystem All. v. USFWS*, 475 F.3d 1136, 1140 (9th Cir. 2007)).

Deference to "the informed exercise of agency discretion" is especially due "where the agency has special 'technical expertise.'" *Trout Unlimited v. Lohn*, 559 F.3d 946, 955 (9th Cir. 2009). Indeed, courts "are to be 'most deferential' when the agency is

'making predictions, within its [area of] special expertise, at the frontiers of science.'"
*Lands Council v. McNair,* 537 F.3d 981, 993 (9th Cir. 2008) (citing *Forest Guardians v. U.S. Forest Serv.*, 329 F.3d 1089, 1099 (9th Cir. 2003)). Moreover, "[w]hen specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive." *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989).

## ARGUMENT

### I.  Plaintiffs' Petition did not provide substantial scientific or commercial information such that the petitioned action may be warranted.

When NMFS receives a petition to list or delist a species, its obligation at the 90-day stage is to determine whether that petition "presents substantial scientific or commercial information indicating that the petitioned action may be warranted." 16 U.S.C. § 1533(b)(3)(A); 50 C. F. R. § 424.14(h). "Substantial scientific or commercial information" is defined as "credible scientific or commercial information in support of the petition's claims such that a reasonable person conducting an impartial scientific review would conclude that the action proposed in the petition may be warranted." 50 C.F.R. § 424.14(h)(1)(i). The governing regulations provide additional guidance to this standard, stating that where there have been "prior reviews" of a species, "a petitioned action generally would not be considered to present substantial scientific and commercial information indicating that the action may be warranted unless the petition provides new information not previously considered." *Id.* § 424.14(h)(1)(iii).  Here, Plaintiffs' Petition

failed on all counts. It did not present substantial scientific or commercial information indicating that the petitioned action may be warranted, according to a reasonable person, nor was the information in the Petition "new," as it largely repackaged and recycled arguments and evidence that had already been thoroughly considered in NMFS's Listing Rule – a decision upheld by the Ninth Circuit for its reliance on the "best available science."

Plaintiffs' brief focuses almost entirely on the second prong, alleging that NMFS erred in failing to credit "new information" presented in their Petition. *See, e.g.*, ECF No. 26 at 23. But the governing regulations require a petition to present information that is both "new" *and* that otherwise qualifies as "substantial scientific or commercial information." 50 C.F.R. § 424.14(h)(1)(i)-(iii). And while petitioners are not required to present "conclusive evidence," the burden to present both "new" and "substantial" scientific information falls squarely on Plaintiffs; NMFS is not required to blindly accept information that it determines is "unreliable, irrelevant, or otherwise unreasonable to credit." *Buffalo Field Campaign v. Zinke*, 289 F. Supp. 3d 103, 109-111 (D.D.C. 2018) ("*Buffalo Field Campaign I*"); *see also Wildearth Guardians v. U.S. Sec'y of the Interior*, No. 4:08-cv-00508-EJL-LMB, 2011 U.S. Dist. LEXIS 38736, at *4-5 (D. Idaho Feb. 11, 2011) ("[I]t is the petitioner's burden to provide the Service with the necessary substantial scientific or commercial information.").

Consistent with this legal standard, NMFS sufficiently explained in its 90-day Finding that Plaintiffs' Petition did not meet this burden because it did not present

"credible new information, or identif[y] errors or provide[] a credible new analysis,"
NMFS00171-72, as outlined below.

### A. FWS's not warranted listing decision for the Pacific walrus does not conflict with NMFS's Listing Rule for the Arctic Ringed Seal.

Plaintiffs' first assert that NMFS failed to credit analysis found in FWS's not warranted listing decision for the Pacific walrus that "contradicts" NMFS's use of climate modeling in its Listing Rule for the Arctic ringed seal because FWS concluded in its decision that climate projections beyond 2060 are too speculative. ECF No. 26 at 26. Plaintiffs' description of FWS's listing decision, however, fundamentally mischaracterizes FWS's analysis. In its Pacific walrus decision, FWS determined that the species' predicted *responses* to climate change were too speculative beyond 2060 to warrant listing, not the climate change projections themselves. REF04162. Indeed, FWS's analysis concludes with "high certainty" that "sea-ice availability *will* decline as a result of climate change," but that FWS is unable to reliably predict "how [the Pacific walrus] will respond to those changes." *Id.* (emphasis added).

This analysis has no bearing on whether delisting the Arctic ringed seal may be warranted. As explained in the 90-day Finding, "the Pacific walrus has distinctly different life history and habitat characteristics as compared to the Arctic ringed seal." NMFS00173. Ringed seals have specific habitat requirements, especially for reproduction, as several months of substantial on-ice snow cover is necessary for the survival of seal pups after they are born. REF00102. In contrast, walruses are known to use "terrestrial habitats to rest and nurse their young." REF00876. Moreover, "it is

unclear as to whether or not [sea ice] is a requirement" for the long-term survival of the walrus. REF01091. Accordingly, "given the ability of the Pacific walrus to change its behavior and/or adapt to environmental stressors," FWS explained that "there was much less confidence in predicting Pacific walruses' behavioral responses" to loss of sea ice. NMFS00173. NMFS's 90-day Finding noted that NMFS "did not cite a similar observed adaptability for Arctic ringed seals in the final listing rule" and that Plaintiffs' Petition "presents no new information regarding these conclusions." NMFS00173-74. Thus, contrary to Plaintiffs' assertions that FWS's analysis shows that "reasonable scientists disagree," ECF No. 26 at 26, no conflict exists between FWS's listing determination for the Pacific walrus and NMFS's Listing Rule for the Arctic ringed seal. Plaintiffs' mischaracterization of the climate change projections in FWS's listing determination on the Pacific walrus does not constitute substantial new information that may warrant the petitioned action.

### B. Data from IPCC's AR5 presented in Plaintiffs' Petition do not constitute substantial new information not previously considered.

Plaintiffs' arguments heavily rely on IPCC's AR5, which they assert includes new information demonstrating that there were "errors in the Listing Rule." ECF No. 26 at 26. Plaintiffs claim that the different modeling used in AR5 as compared to AR4 "undercuts" NMFS's conclusions in its Listing Rule for the ringed seal. *Id.* In bringing these claims, however, Plaintiffs continually offer statements that are unsupported by the text of AR5, with many of their citations either out of context or mischaracterizing AR5.

### i. The difference in emissions scenarios in AR5 account for any substantial difference in climate projections from AR4.

For example, Plaintiffs conflate Representative Concentration Pathways ("RCPs"), used in AR5 – which are GHG emissions scenarios used as *inputs* for climate models – with the Coupled Model Intercomparison Project Phase 5 ("CMIP5") – which is the multi-model experiment that the RCPs are run through to produce climate projections. ECF No. 26 at 27; REF01484-85. RCPs were intended to "replace" Special Report on Emission Scenarios ("SRES") – the inputs used in AR4's climate models. REF01484. SRES scenarios were developed from storylines about future demographic and economic development, energy production, and land use, but did not include scenarios that assume implementation of climate mitigation measures. REF01484. Contributors of IPCC AR5 acknowledged the need for scenarios, or "pathways," to inform policymakers of varying limits of GHG emissions needed achieve different climate goals. REF01484-85. The models used to create the RCPs "make no assumptions about how the compatible emissions could or would be achieved, but merely compute the global total emission that is required to follow the $CO_2$ concentration pathway." REF01931. Thus, RCPs were designed to "have different targets" of radiative forcing – the warming effect caused by GHG emissions – at 2100 and include pathways with "implied policy actions to achieve mitigation," but RCPs "do not have probabilities attached to them." REF01484.

Plaintiffs' focus on AR5's updated multi-model experiment, rather than the varying RCP emissions scenarios, inflate the importance of CMIP5 in regard to the difference in projections from AR4 and AR5. It is clear from the text of AR5 that the

choice of emissions scenario is the primary driver of any differences in climate projections in AR5. REF02463. Indeed, "the differences in the projected warming *are largely attributable to the difference in scenarios*, and the change in the future and reference period, *rather than to developments in modeling since AR4*." *Id.* (citations omitted) (emphasis added). Multiple sections of AR5 further emphasize this point: "the projected changes in global temperature for 2100 in the RCP scenarios are very consistent with those obtained by CMIP3 for SRES in IPCC AR4 [] when taking into account the differences in scenarios" REF02463; "the overall range of [AR5 projections] is larger [than that of AR4] *primarily because of the low-emission mitigation pathway RCP 2.6*." REF02459 (emphasis added). In other words, projections in AR4 and AR5 reach the same conclusions, and any variance in the model outputs themselves can be accounted for by purely hypothetical GHG emissions scenarios used as inputs in AR5.

This point is also highlighted by the graphic reproduced below, which compares projected radiative forcing when using RCPs with projected radiative forcing when using SRES scenarios from AR4. REF01551. The graph shows that three of the four RCPs closely correspond to the SRES scenarios (RCP 4.5 is close to SRES B1, RCP 6 is close to SRES A1B and RCP 8.5 is close to A2). *Id.* But RCP 2.6, a "strong mitigation scenario," has "no equivalent among the SRES scenarios" used in AR4, which is why the "range of temperature change across all scenarios is wider." REF01485.



### ii. No reasonable scientist would credit RCP 2.6 as an emissions scenario likely to occur.

Plaintiffs argue that NMFS erred in failing to properly credit RCP 2.6, a scenario where "global temperatures trend downward," in evaluating the differences in projection trends between AR4 and AR5, ECF No. 26 at 32. RCP 2.6, however, is an "aggressive mitigation scenario," as it results in a peak and subsequent decline in GHG emissions by 2030 and negative emissions by 2080. REF02459. AR5 notes that both RCP 4.5 and RCP 2.6 simulate widespread implementation of bio-energy with carbon-capture and storage technology to achieve a reduction in emissions, which has not yet been tested on an industrial scale. REF01952. Further, FWS's Status Report for the Pacific walrus notes that while no RCP "was considered more likely than another when developed . . . RCP 2.6 will require unprecedented global commitments and technologies that raise doubts

about its relative likelihood." REF00930 (citations omitted). Accordingly, RCP 2.6, and the model output it produced, does not represent new credible scientific information suggesting delisting may be warranted because it does not describe what will occur or even what might occur in the future. NMFS00173. Rather, the RCP 2.6 model output presents a hypothetical scenario in which GHG emissions could peak and then fall if untested technologies were adopted and there were unprecedented (and as-yet-unplanned) reductions in GHG emissions. *Id.* (RCP 2.6 would require "unprecedented" reductions); *id.* at 00174-75 (explaining that even RCP 4.5, the "intermediate stabilization scenario" is unlikely based on current trends). No reasonable scientist would rely on such hypotheticals in projecting future habitat conditions for Arctic ringed seals.

Plaintiffs expand on this point in their Petition, stating that "published research indicates that international and domestic policy commitments" will result in a significant reduction in GHG emissions, in alignment with the "intermediate stabilization scenario," RCP 4.5. NMFS00123. The cited study in support of this assertion, however, "does not, in fact, reach that conclusion;" rather, the study merely assessed necessary reductions in emissions in order to ensure that warming in this century remains below 2°C. NMFS00174. The cited study does not "opine as to how likely it is that such actions would occur." *Id.* Instead, the study concludes that for GHG emissions to follow the RCP 4.5 scenario, "[c]onditional as well as unconditional pledges" in accordance with the United Nations Framework Convention on Climate Change Paris Agreement must be met, and these commitments, which generally extend to 2030 under the Paris Agreement,

must be "propagated forward to 2060." *Id.*; REF01269. In addition, NMFS acknowledges that while "there is some progress" in regulatory mechanisms addressing GHG emissions, Plaintiffs' Petition presented no new information that supports their assertion that current global emission trends are declining or that climate goals pursuant to the Paris Agreement will be met. NMFS00173-4; NMFS00177-78 (noting that the United States announced its intent to withdraw from the Paris Agreement in 2019). Indeed, the best available evidence is to the contrary. This was thoroughly explained in NMFS's 90-day Finding. NMFS00173 ("[T]rends in global annual emissions have been described as consistent with high-end emissions scenarios" and projected warming in AR5 is "clear and unidirectional . . . aside from a scenario that assumes unprecedented global GHG emissions reductions and new technologies."); *id.* at 0174.

### iii. AR4 and AR5 reach the same conclusions.

Most importantly, when removing consideration of the hypothetical projections produced using RCP 2.6 in accordance with current emissions trends, AR5 reaches the same conclusions as AR4 and NMFS's Status Review: that global temperatures are projected to increase throughout the 21st century. REF01425. AR5 explains that "[p]rojected climate change based on RCPs is similar to AR4 in both patterns and magnitude, after accounting for scenario differences." REF01425. Global surface temperature change for the end of the 21st century is "more likely than not" to exceed 2°C for all scenarios except RCP 2.6. *Id.* These results align with AR4's projections. *See* REF04924 (showing that global average surface warming for the end of the 21st century exceeds 2°C for all scenarios except one in AR4). REF01486. AR5 further concludes that

"continued emissions of greenhouse gases will cause further warming and changes in all components of the climate system" and that "limiting climate change will require substantial and sustained reductions of greenhouse gas emissions." REF01425. NMFS clearly explained this in response to Plaintiffs' Petition: "although the magnitude of the warming depends somewhat on the assumed emissions scenario, the trend is clear and unidirectional." NMFS00173 (citation omitted).

Contrary to Plaintiffs' assertions, AR5's projections of sea ice decline also align with conclusions from NMFS's Status Review. Plaintiffs again mischaracterize AR5's results in stating that projections show there will be "significant amounts of sea ice from 2081 to 2100," ECF. No. 26 at 28, whereas AR5 actually comes to the opposite conclusion: the multi-model mean in September Arctic sea ice extent shown in the maps reproduced in Plaintiffs' brief, *id.*, actually *underestimates* already observed sea ice extent. REF02492. In response to this, multiple contributors to AR5 chose a subset of models "based on their present-day Arctic sea ice simulations" to more accurately project sea ice decline. REF02494. The results of running this subset of models "all suggest a faster rate of summer Arctic sea decline than the multi-model mean" and "[a]mong the five selected models . . . four project a nearly ice-free Arctic Ocean in September" before 2050 for RCP8.5 and before 2080 for RCP4.5. REF02495. The average reduction in September Arctic sea ice over the chosen subset "ranges from 56% for RCP 2.6 to 100% for RCP8.5." *Id.* AR5 concluded that "[in] light of all these results, it is *very likely* that the Arctic sea ice cover will continue to shrink and thin all year round during the 21st

century as the annual mean global surface temperature rises." REF02497. In other words, AR5 presents no new substantial information on future sea ice loss beyond what was considered in NMFS's Listing Rule.

Similar methods were used to correct for differences in observational trends of sea ice decline in NMFS's Status Review. REF00065. In culling poor-performing models, NMFS chose a subset that "demonstrated [the] ability to reproduce observed features of recent climate" by using the cited methodology behind choosing specific model subsets for sea ice projections in AR5. *Id.*; REF02495. While Plaintiffs criticize NMFS's elimination of models in accordance with observed sea ice extent, ECF No. 26 at 30, AR5 concludes that CMIP5's results for projected sea ice decline "lend support for weighting/recalibrating the models based on their present-day Arctic sea ice simulations." REF02494.

Plaintiffs' assertion that their Petition contains new information not previously considered because AR5 demonstrates a "divergence" in climate projections depending on different emissions scenarios "beyond mid-century," ECF No. 26 at 16, is also without merit. Both AR4 and NMFS's Status Review used climate projections that similarly diverge beyond 2055 depending on emissions scenarios. REF00064 ("[E]specially by 2100, the choice of the emissions scenario becomes the major source of variation among climate projections."). Indeed, Plaintiffs admit as much in their brief: "NMFS's status review team recognized that the CMIP3 models and their projections . . . had substantial variability given the range of greenhouse gas emission scenarios." ECF No. 26 at 26.

In addition, Plaintiff State of Alaska submitted public comments on NMFS's proposed rule to list the ringed seal with nearly identical wording to the alleged "new" information from AR5. NMFS00045. The comments state that climate projections "beyond 2050" used in Status Review for the ringed seal "are too heavily dependent on socioeconomic assumptions and are therefore too divergent for reliable use." NMFS00045. As explained in NMFS's Final Rule – and reiterated in NMFS's 90-day Finding – NMFS recognized the uncertainty of climate projections beyond mid-century and "incorporated that consideration into [the] assessments of the threats and the species' responses to the threats." NMFS00172; *see also* NMFS00045. Accordingly, the uncertainty of climate projections beyond mid-century described in AR5 does not constitute substantial new information not already considered. *See Defs. of Wildlife v. USFWS*, 584 F. Supp. 3d 812, 833 (N.D. Cal. 2022) (holding FWS applied the correct standard at 90-day review stage when FWS "explained that it had previously considered many of the sources in the Petition in prior reviews of the [species] and thus, they did not present substantial new information" and FWS properly "relied on its experience and records in concluding that the Petition did not contain information warranting a more in-depth review") (citations omitted).

### C. Plaintiffs' Petition does not present new substantial information regarding on-ice snow cover.

Plaintiffs' Petition also asserts that new information demonstrates that the 2012 listing decision for the Arctic ringed seal "overestimate[ed] the magnitude of future declines in snow cover." NMFS00124. While Plaintiffs claim that NMFS "improperly

ignored" new snow cover projections from AR5, ECF No. 26 at 33, the 90-day Finding

explains that studies cited in the Petition addressed modeling of snow cover on "land

surfaces," when what is "of importance to Arctic ringed seals" is the availability of sea

ice "with average snow depths that are sufficient for the formation and maintenance of

birth lairs." NMFS00174. Snow cannot accumulate on the surface of open water, so

where there is no sea ice there can be no snow cover for birth lairs. Accordingly, NMFS

considered climate model projections of snow depths specifically on Arctic sea ice in the

Listing Rule for the Arctic ringed seal. *Id*. NMFS further explained that "[f]uture snow

depths on sea ice cannot be inferred from the studies discussed in the Petition regarding

snow on land surfaces," which is why the cited studies "do not address the concern in the

final listing rule that habitat suitability for Arctic ringed seals was likely to decline." *Id.*

The 90-day Finding therefore provided sufficient explanation for why the cited studies

regarding snow cover projections do not present substantial scientific or commercial

information indicating that the petitioned action may be warranted.

### D. Plaintiffs' Petition does not provide new substantial information regarding population size and resiliency to habitat change.

Finally, Plaintiffs' assertion that NMFS failed to credit "new biological

information" presented in the Petition that "undercut[s]" NMFS's listing determination

for the Arctic ringed seal lacks merit. ECF No. 26 at 34. The information Plaintiffs cited

in support for their claim that the ringed seal "population continues to number in the

millions," *id.*, includes an abundance estimate in the U.S. portions of the Chukchi and

Beaufort Seas that, although Plaintiffs claim is new, was actually presented in the Status

Report for the Arctic Ringed seal, which informed NMFS's Listing Rule. NMFS00175. Additional cited support for Plaintiffs' population assertions includes an extrapolation "based on an assumption that the proportion of pups in 'a stable population' is about 54 percent. However, because a mature female produces only one pup per year, it is impossible for the pup proportion to be as high as 50 percent of the total population." *Id.* As explained in the 90-day Finding, other cited studies regarding population estimates of Arctic ringed seals are consistent with data already considered in the Listing Rule, as it concluded that although there are no specific estimates of population size, experts "postulate that it numbers in the millions." *Id.*

Moreover, Plaintiffs' contention that populations are currently healthy despite "observed changes in sea ice extent" is not inconsistent with a species facing more extreme threats that would cause it to become in danger of extinction in the foreseeable future. NMFS00175. Current habitat changes "do not represent the magnitude of anticipated 21st century warming, loss of sea ice, and reduced on-ice snow depths," and are in fact "minor" in comparison. NMFS00176. "As explained in the final listing rule and the Status Review Report, earlier warming and break-up of ice and inadequate snow for lairs are expected to lead to poor survival of young seals and cause consequent demographic impacts within the foreseeable future." *Id.* This is in accordance with the ESA's requirement that a species be listed as "threatened" if it is "*likely to become* an endangered species within the foreseeable future," 16 U.S.C. § 1532(20) (emphasis

added); the risk of extinction for the Arctic ringed seal is not imminent but exists in the foreseeable future.

These findings are consistent with listing decisions upheld by both the Ninth and the D.C. Circuit. *See AOGA I*, 840 F.3d 666 (9th Cir. 2016) ("[NMFS] need not wait until a species' habitat is destroyed to determine that habitat loss may facilitate extinction."); *Jewell*, 815 F.3d 544 (9th Cir. 2016) (finding that FWS's concern with "protecting the future of the species, not merely the preservation of existing bears" aligned with requirements of the ESA); *In re Polar Bear ESA Listing,* 709 F.3d 1 (D.C. Cir. 2013) (holding FWS's final rule listing the polar bear as threatened was reasonable despite studies showing current populations were relatively healthy).

Accordingly, Plaintiffs' Petition does not present substantial scientific or commercial information concerning the Arctic ringed seal's likely response to Arctic warming within the foreseeable future.

## II.     Plaintiffs' brief largely recycles arguments previously rejected by the Ninth Circuit.

Much of Plaintiffs' brief is repetitive of views expressed in their previous challenge to NMFS's Listing Rule for the Arctic ringed seal, which, as outlined above, were expressly rejected by the Ninth Circuit in *AOGA II.* 722 Fed. App'x 666. For example, Plaintiffs consistently take issue with NMFS's reliance on AR4's long-term climate models through 2100 in its Listing Rule for the ringed seal, alleging that the models were too "speculative." ECF No. 26 at 22. Yet the "new" information from AR5 that Plaintiffs claim "undercuts" NMFS's reliance on AR4 climate models *also* projects

uncertainty beyond mid-century, which Plaintiffs claim demonstrates that NMFS's

Listing Rule for the ringed seal is too speculative. *Id.* This is the exact argument made by

Plaintiffs in public comments submitted to NMFS on the proposed listing rule, to the

court in *AOGA II*, and again in their Petition to Delist. But as noted above, and as

Plaintiffs admitted in their brief, ECF No. 26 at 14, the Ninth Circuit squarely upheld

NMFS's reliance on long-term climate models in its listing determinations. *AOGA II.* 722

Fed. App'x at 668; *AOGA I*, 840 F.3d at 683. Accordingly, the Court should reject

Plaintiffs' thinly veiled attempts to relitigate issues already well-settled in law.

### III. NMFS applied the correct standard in its review of Plaintiffs' Petition to delist.

Plaintiffs are also mistaken in asserting that NMFS applied the wrong legal

standard in failing to credit "new information" without providing analysis as to why

information presented in the Petition does not support that delisting may be warranted.

ECF No. 26 at 23. As explained above, NMFS did, in fact, apply the appropriate standard

when it fully assessed all of the information presented in Plaintiffs' Petition and

reasonably determined that the Petition failed to present substantial scientific or

commercial information indicating that the listing may be warranted. *See Palouse Prairie

Found. v. Salazar,* 383 F. App'x 669, 670 (9th Cir. 2010) ("The Service's analysis in its

90-day finding does not suggest that it applied a different standard than the one it

stated.").

Contrary to Plaintiffs claims, ECF No. 26 at 23, NMFS did not discount

information presented in their Petition or fail to explain its disagreement or reasoning at

the 90-day stage, as the court found occurred in *Campaign v. Williams.* 579 F. Supp. 3d 186, 201 (D.D.C. 2022) (*Buffalo Field Campaign II*). Instead, NMFS clearly addressed in its 90-day Finding each assertion and study cited in Plaintiffs' Petition and thoroughly explained why much of the information cited was not "new information not previously considered," and why any supposedly new information—including snow depth studies and projections made with RCP 2.6—was "unreasonable to credit." *Buffalo Field Campaign I*, 289 F. Supp. 3d at 110-11 (holding that while FWS must explain why a petition's cited studies "unreliable, irrelevant, or otherwise unreasonable to credit" but that FWS is not required "to accept any and all positions that a petition advances"). Accordingly, NMFS has fully complied with its obligations under the ESA and APA.

IV.     **No remedy is necessary and Plaintiffs' request that the Court direct NMFS to issue a positive 90-day finding is not appropriate.**

For the foregoing reasons, the Court should uphold NMFS's 90-day Finding and thus does not need to provide any remedy. Even if the Court were to find a flaw with the 90-Day Finding, the Court should not direct NMFS to issue a positive 90-day finding as Plaintiffs suggest, ECF No. 26 at 39. It is well-settled that if a court determines that an agency action is unlawful, "the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985); *see also N. Air Cargo v. U.S. Postal Serv*., 674 F.3d 852, 861 (D.C. Cir. 2012) ("When a district court reverses agency action and determines that the agency acted unlawfully, ordinarily the appropriate course is simply to identify a

legal error and then remand to the agency, because the role of the district court in such situations is to act as an appellate tribunal.").

Further, Plaintiffs offer no support for their argument that the Court should direct NMFS to issue a positive 90-day finding on remand, ECF No. 26 at 39. Plaintiffs heavily rely on *Buffalo Field Campaign II*, yet that court declined to instruct FWS to make a positive 90-day finding and proceed to a 12-month review even though it agreed that FWS applied the wrong standard in issuing a negative 90-day finding. 579 F. Supp. 3d at 206. The court explained that "the question before the Court is not whether the Yellowstone bison should be listed as endangered or threatened or even whether listing 'may be warranted,' 16 U.S.C. § 1533(b)(3)(A)," but only whether the agency made "an error of law" in applying the wrong standard at the 90-day phase. *Id.* The court reasoned that agency actions found to be unlawful must be remanded to the agency except in "rare circumstances" in which an agency acts in bad faith or departs from its usual process. *Id.*

Plaintiffs' only contention that such a "rare circumstance" occurred here is that "the best available science that NMFS itself previously relied on undercuts its prior analysis in the Listing Rule." ECF No. 26, at 39. This is far from the requirement for such rare circumstance set out in *Buffalo Field Campaign II* that NMFS act in "bad faith" or depart from its "usual" review process. 579 F. Supp. 3d at 206. To the contrary, as outlined above, NMFS adequately addressed each claim of new evidence expressed in Plaintiffs' Petition and offered sufficient explanation as to why each was not "substantial scientific or commercial information" as required under the ESA and applicable

regulations. Accordingly, even if the Court were to find NMFS's negative 90-day finding unlawful, it should the Court should reject Plaintiffs' request to direct NMFS to issue a positive 90-day finding.

## <u>CONCLUSION</u>

As demonstrated above, NMFS fully complied with its obligations under the ESA and APA when it determined Plaintiffs' Petition failed to present substantial scientific or commercial information indicating that delisting the Arctic subspecies of ringed seal may be warranted. Therefore, the Court should deny Plaintiffs' summary judgment motion and enter judgment in favor of Defendant.

Dated: July 21, 2023        Respectfully submitted,

TODD KIM
Assistant Attorney General
U.S. Department of Justice
Environment & Natural Resources Division
JAY GOVINDAN, Section Chief
Wildlife & Marine Resources Section
MEREDITH L. FLAX, Deputy Chief

*/s/ Bonnie M. Ballard*
BONNIE M. BALLARD,
Trial Attorney
Wildlife & Marine Resources Section
Ben Franklin Station
P.O. Box 7611
Washington, D.C. 20044
Tel: (202) 305-1513
Email: Bonnie.M.Ballard@usdoj.gov

*Attorneys for Federal Defendant*

## CERTIFICATE OF SERVICE

I hereby certify that on July 21, 2023, I electronically filed the foregoing document with the Clerk of the Court via CM/ECF system, which will send notification of such to the attorneys of record.

*/s/ Bonnie M. Ballard*
BONNIE M. BALLARD