Kristen Monsell (*admitted pro hac vice*)
Emily Jeffers (*admitted pro hac vice*)
CENTER FOR BIOLOGICAL DIVERSITY
1212 Broadway, Ste. 800
Oakland, CA 94612
Phone: (510) 844-7137
Facsimile: (510) 844-7150
Email: kmonsell@biologicaldiversity.org
        ejeffers@biologicaldiversity.org

*Attorneys for Intervenor-Defendant*
*Center for Biological Diversity*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| State of Alaska and North Slope Borough, | |
| *Plaintiffs*, | Case No.: 3:22-cv-00249-JMK |
| v. | **DEFENDANT-INTERVENOR'S** |
| National Marine Fisheries Service, | **ANSWERING BRIEF** |
| *Defendant*, | |
| and | |
| Center for Biological Diversity, | |
| *Defendant-Intervenor*. | |

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................ i

TABLE OF AUTHORITIES ................................................................................... ii

INTRODUCTION ................................................................................................... 1

LEGAL AND FACTUAL BACKGROUND ........................................................ 2

    I.      Endangered Species Act ............................................................ 2

    II.     The Ringed Seal in a Warming Climate ................................. 5

    III.    Ringed Seal Listing and Legal Challenge ............................. 6

    IV.    The Best Available Science on Climate Change in the Arctic ..................... 9

    V.     The Current Lawsuit ................................................................. 10

STANDARD OF REVIEW .................................................................................. 11

ARGUMENT ......................................................................................................... 12

    I.      NMFS Considered the Climate Projections of the AR5 and
           Properly Determined They Do Not Constitute New Information .............. 12

          A.    Plaintiffs Misunderstand the AR5 Findings ..................... 13

          B.    Plaintiffs' Arguments Misunderstand the Agency's Decision
               and the Relevant Legal Standard for Listing Decisions ................. 18

    II.     FWS's Analysis in the Walrus Listing Determination Does
           Not Undercut NMFS's Denial ................................................ 22

    III.    NMFS Properly Evaluated the Biological Information Provided
           in the Petition ............................................................................ 26

CONCLUSION ..................................................................................................... 28

CERTIFICATE OF COMPLIANCE WITH WORD LIMITS ......................... 29

# TABLE OF AUTHORITIES

**Cases**

*Alaska Oil & Gas Ass'n v. Jewell*,
815 F.3d 544 (9th Cir. 2016) ......................................................................... 21

*Alaska Oil & Gas Ass'n v. Pritzker*,
840 F.3d 671 (9th Cir. 2016) .................................................................. passim

*Alaska Oil & Gas Ass'n v. Ross*,
722 Fed. App'x 666 (9th Cir. 2018) ....................................................... passim

*Bldg. Indus. Ass'n v. Norton*,
247 F.3d 1241 (D.C. Cir. 2001) ...................................................................... 3

*Buffalo Field Campaign v. Zinke*,
289 F. Supp. 3d 103 (D.D.C. 2018) ............................................................... 25

*Ctr. for Biological Diversity v. Bernhardt*, No. 3:18-cv-00064-SLG,
2019 U.S. Dist. LEXIS 165439 (D. Alaska Sept. 26, 2019) ........................... 23

*Ctr. for Biological Diversity v. Haaland*,
998 F.3d 1061 (9th Cir. 2021) ...................................................................... 24

*Ctr. for Biological Diversity v. Kempthorne*, No. 07-0038-PHX-MHM,
2008 U.S. Dist. LEXIS 17517 (D. Ariz. Mar. 6, 2008) .................................. 25

*Defs. of Wildlife v. Babbitt*,
958 F. Supp. 670 (D.D.C. 1997) ...................................................................... 4

*Defs. of Wildlife v. Norton*,
258 F.3d 1136 (9th Cir. 2001) ......................................................... 18, 21, 22

*Friends of the Earth v. Hintz*,
800 F.2d 822 (9th Cir. 1986) ........................................................................ 11

*In re Polar Bear*,
794 F. Supp. 2d 65 (D.D.C. 2011) ................................................................. 18

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) ........................................................................................ 12

*Pac. Coast Fed'n of Fishermen's Ass'ns v. Nat'l Marine Fisheries Serv.,*
265 F.3d 1028 (9th Cir. 2001) ........................................................... 11

*San Luis & Delta-Mendota Water Auth. v. Jewell,*
747 F.3d 581 (9th Cir. 2014) ......................................................... 3, 24

*Sw. Ctr. for Biological Diversity v. Babbitt,*
215 F.3d 58 (D.C. Cir. 2000) ............................................................ 20

*Tenn. Valley Auth. v. Hill,*
437 U.S. 153 (1978) ........................................................................... 3

**Statutes**

5 U.S.C. 706(2)(A) ........................................................................... 11

16 U.S.C. § 1531(b) ........................................................................... 2

16 U.S.C. § 1532(6) ........................................................................... 3

16 U.S.C. § 1532(16) ......................................................................... 3

16 U.S.C. § 1532(20) ................................................................... 1, 2, 3

16 U.S.C. § 1533 ................................................................................ 1

16 U.S.C. § 1533(a)(1) ..................................................................... 22

16 U.S.C. § 1533(a)(3) ....................................................................... 4

16 U.S.C. § 1533(b)(1)(A) .................................................................. 3

16 U.S.C. § 1533(b)(3) ....................................................................... 4

16 U.S.C. § 1533(b)(3)(A) .................................................................. 4

16 U.S.C. § 1533(f) ............................................................................ 4

16 U.S.C. § 1536(a)(2) ....................................................................... 4

**Regulations**

50 C.F.R. § 402.01(b) ................................................................................... 3

50 C.F.R. § 424.14(c)(5)–(6) ...................................................................... 28

50 C.F.R. § 424.14(d)(5) ............................................................................... 4

50 C.F.R. § 424.14(h)(1) ............................................................................... 4

50 C.F.R. § 424.14(h)(1)(iii) ......................................................................... 4

**Federal Register Notices**

75 Fed. Reg. 65,239 (Oct. 22, 2010) ........................................................... 7

76 Fed. Reg. 7634 (Feb. 10, 2011) ............................................................. 24

77 Fed. Reg. 76,740 (Dec. 28, 2012) ..................................................... 7, 23

79 Fed. Reg. 53,852 (Sept. 10, 2014) ......................................................... 24

82 Fed. Reg. 46,618 (Oct. 5, 2017) .................................................. 22, 23, 24

# INTRODUCTION

The Arctic ringed seal is an ice dependent species whose habitat is rapidly disappearing in the face of climate change. The ringed seal requires sea ice as a platform from which to hunt, mate, molt, and evade predators. And unlike other ice seals, ringed seals also rely on a thick layer of snow on top of the ice to build caves where they rest, give birth, and nurse their young. Without sufficient sea ice and snow cover on this ice, the ringed seal cannot survive. Yet the international scientific consensus on climate change shows that the earth will continue to warm throughout this century and that this warming will cause a dramatic decline of sea ice and snow cover in the Arctic. In light of this overwhelming evidence, the National Marine Fisheries Service (NMFS) in 2012 listed the Arctic ringed seal as "threatened" under the Endangered Species Act (ESA). *See* 16 U.S.C. §§ 1532(20), 1533.

Plaintiffs previously challenged the listing, claiming the climate science was not certain enough to support NMFS's decision. The Ninth Circuit Court of Appeals upheld the listing, holding that "uncertainty regarding the speed and magnitude" of the decline of Arctic sea ice and snow cover does not undermine the agency's determination that the loss of this habitat would jeopardize the ringed seals' survival by the end of the century. *Alaska Oil & Gas Ass'n v. Ross*, 722 Fed. App'x 666, 668 (9th Cir. 2018) (citation omitted).

Unsatisfied, Plaintiffs petitioned NFMS to delist the ringed seal in 2019, and NMFS rightly denied Plaintiffs' renewed efforts to strip the ringed seal of its ESA protections in 2020. No new science on climate change or ringed seal biology supports

Plaintiffs' position that delisting the ringed seal may be warranted. To the contrary, the best available science—including the climate models on which Plaintiffs rely—continue to show the Arctic will be seasonally ice free by the end of the century, with average snow depths that fail to meet the minimum depth needed for the formation and maintenance of birth lairs across most of the species' range. No information indicates the ringed will be able to survive such significant destruction of its only habitat.

In arguing otherwise, Plaintiffs misunderstand the Intergovernmental Panel on Climate Change's Fifth Assessment Report, and they mischaracterize a decision of the U.S. Fish and Wildlife Service (FWS) that also relied on climate projections through the end of the century in evaluating a listing petition for another ice-dependent species. Plaintiffs also ignore the explanations NMFS provided in its decision denying Plaintiffs' petition, disregard the ESA's requirement that NMFS base listed decisions on the best available science, and rehash arguments the Ninth Circuit has already rejected.

In short, the best available science continues to demonstrate that the ringed seal "is likely to become an endangered species within the foreseeable future." 16 U.S.C. § 1532(20). This Court should uphold NMFS's denial of Plaintiffs' petition.

## LEGAL AND FACTUAL BACKGROUND

### I.    Endangered Species Act

Congress enacted the ESA "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such … species." 16 U.S.C. § 1531(b). As the Supreme Court has noted, the ESA is "the most comprehensive legislation for the

preservation of endangered species ever enacted by any nation," and "[t]he plain intent of Congress in enacting this statute was to halt and reverse the trend toward species extinction, whatever the cost." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 180, 184 (1978).

The ESA directs NMFS to determine whether species are threatened or endangered.[1] A species is endangered when it "is in danger of extinction throughout all or a significant portion of its range." 16 U.S.C. § 1532(6). A species is threatened when it is "likely to become an endangered species within the foreseeable future." *Id*. § 1532(20).[2] NMFS "determine[s] the timeframe for its 'foreseeable future' analysis based upon the best data available for a particular species and its habitat." *Alaska Oil & Gas Ass'n v. Pritzker*, 840 F.3d 671, 681 (9th Cir. 2016) (citations omitted).

NMFS must base all listing determinations "solely on the basis of the best scientific and commercial data available." 16 U.S.C. § 1533(b)(1)(A). The standard does not require perfect data. "[T]he 'best scientific … data available,' does not mean 'the best scientific data possible.'" *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 602 (9th Cir. 2014) (alterations in original) (quoting *Bldg. Indus. Ass'n v. Norton*, 247 F.3d 1241, 1246 (D.C. Cir. 2001)). Requiring reliance upon the best available scientific data, as opposed to scientific certainty, "is in keeping with congressional intent"

---

[1] NMFS and the FWS share responsibility for administering the ESA. 50 C.F.R. § 402.01(b). In general, FWS has authority over terrestrial and freshwater species and NMFS has authority over marine species, including the ringed seal. FWS has authority over a few marine mammals, including the walrus.

[2] The ESA defines a "species" to include a "subspecies" and "distinct population segment." 16 U.S.C. § 1532(16).

that an agency "take preventive measures before a species is 'conclusively' headed for extinction." *Defs. of Wildlife v. Babbitt*, 958 F. Supp. 670, 679–80 (D.D.C. 1997).

Once a species is listed, an array of statutory protections applies. For example, section 7 requires all federal agencies to ensure their actions do not "jeopardize the continued existence" of any listed species. 16 U.S.C. § 1536(a)(2). Section 4(a)(3) requires NMFS to designate "critical habitat" for listed species, *id*. § 1533(a)(3), and section 4(f) mandates that NMFS develop and implement recovery plans—a roadmap to how a listed species can eventually be secure from the risk of extinction and removed from the list of threatened and endangered species, *id*. § 1533(f).

Individuals may petition NMFS to list or delist species under the ESA. *See id*. § 1533(b)(3). The petition must present a "complete, balanced representation of the relevant facts, including information that may contradict claims in the petition." 50 C.F.R. § 424.14(d)(5). NMFS then determines whether "the petition presents substantial scientific or commercial information indicating that the petitioned action may be warranted." *Id*. § 424.14(h)(1). This determination must typically occur within 90 days of NMFS's receipt of the petition and is known as a 90-day finding. *See* 16 U.S.C. § 1533(b)(3)(A); 50 C.F.R. § 424.14(h)(1). In evaluating a petition for delisting at the 90-day stage, NMFS only considers "new information not previously considered" and evaluates "whether a reasonable person conducting an impartial scientific review would conclude that the action proposed in the petition may be warranted despite the previous review or finding." 50 C.F.R. § 424.14(h)(1)(iii).

## II.      The Ringed Seal in a Warming Climate

The importance of sea ice and snow accumulation for Arctic ringed seals is well documented in the scientific literature and the administrative record. In fact, ringed seals are the most ice-dependent of all Arctic seals and use sea-ice habitats in ways that other seals cannot. REF00020; NMFS00009. Ringed seals make breathing holes in the landfast ice—the sea ice that forms along Arctic coastlines each autumn and winter—which allow them to feed in coastal waters under the ice, while still maintaining enough places to surface and breathe. REF00020; NMFS00009.

And unlike other seals, ringed seals excavate caves in the snow over their breathing holes, forming subnivean lairs (i.e., "snow caves"). REF00020; *see* NMFS00032–33. These snow caves hide seals from predators and provide insulation from the extreme cold while seals are resting, and while adult females are whelping and nursing their young. REF00027; NMFS00032–34

Snow caves are especially important in spring when pups are born and nursed. Without these snow caves, pups freeze to death or are eaten by polar bears, Arctic foxes, or other animals. NMFS00032, NMFS00034; REF00103, REF00119–20. One study showed that ringed seal recruitment in areas where the average snow depth in April and May was less than 32 centimeters dropped sharply *to near zero*. REF00102. Another study found that when lack of snow cover forced birthing to occur in the open, "*nearly 100 percent of pups died from predation.*" *Id.* (emphasis added). Yet another study concluded that warming temperatures that melt snow-covered birth lairs result in pups suffering from hypothermia or freezing to death. *Id.*

"Snow drifts to 45 [centimeters] or more are needed for excavation and maintenance of simple lairs, and birth lairs require depths of 50 to 65 [centimeters] or more." NMFS00033 (citing scientific studies). Such drifts typically only occur on flat ice where average snow depths are at least 20–30 centimeters "and where drifting has taken place along pressure ridges or ice hummocks." *Id.* (citing scientific studies). Areas with less than 20 centimeters average snow depth in April are inadequate for the formation of ringed seal birth lairs. *Id.*; NMFS00048.

Sea ice is essential to the formation of snow caves. The loss of sea ice as a platform to collect snow substantially reduces the amount of snow that can accumulate. NMFS00044; *see* REF00012. In addition to being necessary for the accumulation of snow, sea ice serves other important life functions—Arctic ringed seals typically do not come ashore and use sea ice for resting throughout the year, and for pupping and molting. REF00199; NMFS00032.

Earlier sea ice breakup causes premature weaning of pups before they are fully developed, leading to lower pup body condition and high pup mortality, and is associated with lower pregnancy rates. REF00102; NMFS00032. As such, scientists have "concluded that the depth of snow cover and the timing of ice break-up [are] 'the key factors affecting' reproduction and population trajectories of ringed seals." REF00120 (citation omitted).

## III.    Ringed Seal Listing and Legal Challenge

In May 2008, the Center petitioned NMFS to list three ice-dependent seals under the Endangered Species Act based on the threat of sea ice loss due to climate change: the

ringed seal, bearded seal, and spotted seal. NMFS00029. NMFS listed the southern distinct population segment of the spotted seal as threatened in 2010, 75 Fed. Reg. 65,239 (Oct. 22, 2010), and listed the Beringia distinct population segment of the bearded seal and the Arctic subspecies of the ringed seal as threatened species in 2012. NMFS00029–61 (ringed seal); 77 Fed. Reg. 76,740 (Dec. 28, 2012) (bearded seal). In doing so, NMFS found that the principal threat to all species "is habitat alteration stemming from climate change." NMFS00030.

NMFS analyzed the threats to the ringed seal stemming from climate change through the end of the 21st century. Using observational and predictive data from the Intergovernmental Panel on Climate Change's (IPCC) Fourth Assessment Report (AR4), NMFS analyzed the extent of Arctic sea ice and snow cover loss within the foreseeable future, and then evaluated the effects on the ringed seal from such habitat loss.

NMFS explained that, because of the time lag between emissions and climactic changes, the model projections to 2050 are "primarily due to emissions that have already occurred and those that will occur over the next decade." NMFS00046. As such, "conditions projected to mid-century are less sensitive to assumed future emissions scenarios." *Id.*

To account for uncertainty in the IPCC's 2050 to 2100 predictions, NMFS used two models considered to be particularly reliable with respect to Arctic sea ice, and it used "medium" and "high" emissions scenarios to project monthly sea ice concentrations, which is the typical scientific procedure for measuring future impacts. *Id.*; REF00057, REF00074. NMFS declined to use AR4's lowest emissions scenarios because achieving

those scenarios assumed the adoption of non-existent regulatory mechanisms, NMFS00046, and the ESA only allows NMFS to consider *existing* regulatory mechanisms. *See* 16 U.S.C. § 1533(a)(1)(D). The agency also noted the observed rate of decline was more extensive than models projected, "suggesting that the projections of sea ice declines within this century may in fact be conservative." NMFS00046.

NMFS explained that while "projections of [greenhouse gas emissions] become increasingly uncertain and subject to assumed emissions scenarios in the latter half of the 21st century, projections of air temperatures *consistently indicate that warming will continue throughout the century.*" *Id.* (emphasis added). And while "the magnitude of the warming depends somewhat on the assumed emissions scenario, *the trend is clear and unidirectional.*" *Id.* (emphasis added); *see also id.* (noting "there is relatively little uncertainty that warming will continue."). This warming means "that loss of sea ice and reduced snow cover will continue throughout the 21st century." *Id.* NMFS also explained that ten additional models compiled after the AR4 confirmed its projections about the substantial decline in snow cover through 2100. NMFS00044.

Based on these models and other science, NMFS concluded that "[w]ithin this century, snow cover is forecasted to be inadequate for the formation and occupation of birth lairs over most of the subspecies' range." NMFS00039. NMFS further determined that such losses would likely cause the extirpation of Arctic ringed seals from most places they live and threaten the species with extinction within the foreseeable future. *Id*. NMFS listed the Arctic subspecies of ringed seal as threatened as a result. *Id.*

*State of Alaska, et al. v. NMFS*                                                          8
Case No. 3:22-cv-00249-JMK
Case 3:22-cv-00249-SLG     Document 29     Filed 07/21/23     Page 13 of 34

Plaintiffs and oil and gas industry groups subsequently challenged NMFS's bearded and ringed seal listing determinations, asking the court to ignore the myriad of scientific evidence supporting NMFS's decisions simply because there is some uncertainty involved in modeling the impacts of climate change. *See Pritzker*, 840 F.3d at 674–75 (bearded seal); *Ross*, 722 Fed. App'x at 668 (ringed seal). But the use of models to project future impacts is widely accepted by federal agencies, scientists and the courts; in upholding the listing of both species, the Ninth Circuit Court of Appeals declared that "the IPCC climate models constitute[ ] 'the best available science' and reasonably support[ ] the determination that a species reliant on sea ice likely would become endangered in the foreseeable future." *Pritzker*, 840 F.3d at 679 (citation omitted); *Ross*, 722 Fed. App'x at 668 (citation omitted).

The Ninth Circuit further held that courts cannot require the agency to "wait until it ha[s] quantitative data reflecting the species' decline … before it [can] adopt conservation policies to prevent that species' decline." *Prizker*, 840 F.3d at 683; *Ross*, 722 Fed. App'x at 668. As such, "[u]ncertainty regarding the speed and magnitude of" sea ice and snow cover loss "does not invalidate data presented in the administrative record that reasonably supports the conclusion that loss of habitat at key life stages will likely jeopardize the [Arctic ringed seal's] survival over the next 85 years." *Ross*, 722 Fed. App'x at 668 (alteration in original) (citation omitted).

## IV.    The Best Available Science on Climate Change in the Arctic

The best available science continues to show clear and unidirectional loss of Arctic sea ice for the foreseeable future. The IPCC's Fifth Assessment Report (AR5),

published in 2014, found that "[t]here is overall consistency between" climate projections in the AR4 and those in the AR5. REF02436. The AR5 recognizes that the AR4's sea ice projections "might [have been] too conservative" REF02492, and that "over the past three decades, Arctic summer sea ice retreat was unprecedented." REF01414.

For three of the four emissions scenarios analyzed in the AR5, September sea ice essentially disappears before or by the end of the century. REF02495. Even under the lowest emissions scenario, which assumes unprecedented global greenhouse gas emissions reductions and the implementation of new technologies, September sea ice is projected to decline by 43 percent between 1986–2005 and 2081–2100. REF01497. In short, the best available science continues to demonstrate that "[i]t is *very likely* that the Arctic sea ice cover will continue to shrink and thin all year round during the 21st century." REF02400, REF02497.

## V.    The Current Lawsuit

Plaintiffs submitted a petition to delist the Arctic ringed seal in March of 2019, alleging that information newly available since the 2012 listing indicates that delisting is warranted. NMFS00071, NMFS00088–96. The petition contended that climate models developed for the AR5 "provide new information indicating that climate model projections diverge considerably after mid-century, especially in high-latitude areas," NMFS00172, and that new information demonstrates that NMFS may not rely upon long-term climate projections to establish the foreseeable future. NMFS00173.

In its 90-day finding, NMFS disagreed that the AR5's climate model projections were "new information not previously considered in our listing determination." *Id.*

Rather, like the AR4 models examined in the final listing rule, "the magnitude of the warming depends somewhat on the assumed emissions scenario," but "the trend is clear and unidirectional." *Id.* NMFS noted that global emissions "have been described as consistent with high-end emissions scenarios," and concluded the low emissions scenario of the AR5 was unlikely because it was based on unprecedented reductions in global greenhouse gas emissions. *Id.* NMFS also found the petition raised no new information on ringed seal biology, nor did it present new information regarding the proper scope of the foreseeable future determination. *Id.* (explaining that the foreseeable future determination for the Pacific walrus was inapposite because listing under the ESA is done on a species-by-species basis, and the ringed seal has a distinctly different life history than the walrus).

## <u>STANDARD OF REVIEW</u>

The Administrative Procedure Act governs the standard and scope of judicial review of a negative 90-finding under the ESA. *See Pac. Coast Fed'n of Fishermen's Ass'ns v. Nat'l Marine Fisheries Serv*., 265 F.3d 1028, 1034 (9th Cir. 2001) (noting that "[a]gency decisions under [the] ESA are governed by the Administrative Procedure Act"). Under the Administrative Procedure Act, the applicable standard of review is whether the agency's decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. 706(2)(A); *Pac. Coast*, 265 F.3d at 1034 (quoting same and *Friends of the Earth v. Hintz*, 800 F.2d 822, 830–31 (9th Cir. 1986)).

In applying this standard, "a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983). Rather, the court examines whether the agency considered the relevant factors, "articulate[d] … a rational connection between the facts found and the choice made, … and whether there was a clear error of judgment." *Id.* (citations and internal quotation marks omitted). A court should "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Id*. (citations omitted).

## ARGUMENT

In evaluating Plaintiffs' petition to delist the Arctic subspecies of the ringed seal, NMFS applied the correct legal standard and properly determined that Plaintiffs' petition did "not present substantial scientific or commercial information indicating that the petitioned action may be warranted." NMFS00169. Plaintiffs' contrary arguments misapprehend the relevant science and legal standard, FWS's Pacific walrus listing determination, and NMFS's 90-day finding, all of which only affirm the validity of NMFS's denial of Plaintiffs' petition.

## I.    NMFS Considered the Climate Projections of the AR5 and Properly Determined They Do Not Constitute New Information

Plaintiffs' primary arguments rest on supposedly new information in the AR5. *See* Pls.' Br. 31–38, 40–44.[3] Specifically, Plaintiffs claim that new data in this report "on the certainty of modeling the effects of climate change through 2100" show that NMFS's

_____

[3] Citations to the page numbers in Plaintiffs' brief are to the ECF-generated page numbers.

listing decision was in error. Pls.' Br. 31. But Plaintiffs' argument is based on both a fundamental misunderstanding of the findings in the AR5 and the relevant legal standards. The AR5 confirms that there is *consistency* between the climate projections in the AR4 and those in the AR5. And Plaintiffs' insistence that NMFS cannot rely on these models because they contain some uncertainty not only contravenes the best-available-science standard of the ESA but also regurgitates many of the same arguments the Ninth Circuit already rejected in upholding NMFS's decision to list the ringed seal. The Court should reject Plaintiffs' arguments.

A.     Plaintiffs Misunderstand the AR5 Findings

Plaintiffs erroneously claim that "[t]he new information in AR5, based on different and more sophisticated modeling, undercuts NMFS's conclusion that the AR4 models provided sufficient certainty regarding predicted threats to the ringed seal from projections of changes in sea-ice extent and snow cover in the latter half of the 21st century." Pls.' Br. 33. The AR5 does no such thing.

The AR5 comments on the advancements made in the modeling, but then immediately goes on to state that despite those advancements, "the magnitude of the uncertainties *has not changed* significantly since AR4" and "[t]here is *overall consistency* between the projections … for both large-scale patterns and magnitudes of change." REF02436 (emphasis added). The AR5 further notes the similarity between the model projections regarding declines in sea ice extent through 2100, stating "the [AR5 models] as a group also project decreases in sea ice extent through the end of this century in both

hemispheres under all [emission scenarios]. However, as in the case of [the models used in AR4], the inter-model spread is considerable." REF02492.

The AR5 also states that the observed decline of Arctic summer sea ice has been greater than that estimated in both models used in the AR4 and AR5, indicating that both sets of models may underestimate the rate of sea ice loss. *Id.* The AR5 therefore fully supports NMFS's statement in denying Plaintiffs' petition that the AR5 does not constitute new information regarding divergence in the climate model projections. NMFS00173; *see also* NMFS00238 (NMFS decision memorandum noting that "while the petitioners are correct that the more recent AR5 climate model projections diverge considerably beyond mid-century, this divergence is similar to the pattern reflected in the AR4 and does not constitute new information.").[4]

Plaintiffs also attack NMFS for failing to properly consider the AR5's low emission scenario (RCP2.6). Pls.' Br. 37. However, as NMFS explained in denying Plaintiffs' petition, that scenario "assumes unprecedented global [greenhouse gas] emissions reductions and new technologies," which is unrealistic considering that "[c]urrent trends in global annual emissions have been described as consistent with high-end emissions scenarios." NMFS00173. In other words, the "available information suggests that [greenhouse gas] emissions are not being reduced appreciably" and the petition did not present any substantial new information demonstrating "that existing national and international efforts to limit climate change will be effective at alleviating

---

[4] These statements demonstrate that NMFS did not "ignore" the AR5 in rejecting Plaintiffs' delisting petition as Plaintiffs claim. *See* Pls.' Br. 38, 40.

the expected effects on Arctic ringed seals." NMFS00240;[5] *see also Pritzker*, 840 F.3d at 679 (noting that "[t]here is no debate that temperatures will continue to increase over the remainder of the century and that the effects will be particularly acute in the Arctic. The current scientific consensus is that Arctic sea ice will continue to recede through 2100.").

Plaintiffs also inaccurately assert that the "AR5's models indicate that in three of the four scenarios used for the projections of sea-ice extent, there will be significant amounts of sea-ice from 2081 to 2100." Pls.' Br. 33–34. In support of this argument, Plaintiffs include a portion of a graphic from the AR5 (Figure TS.17), but without the graphic's legend. The full graphic (at REF01497) is as follows:



**Figure TS.17 |** Northern Hemisphere (NH) sea ice extent in September over the late 20th century and the whole 21st century for the scenarios RCP2.6, RCP4.5, RCP6.0 and RCP8.5 in the CMIP5 models, and corresponding maps of multi-model results in 2081–2100 of NH September sea ice extent. In the time series, the number of CMIP5 models to calculate the multi-model mean is indicated (subset in brackets). Time series are given as 5-year running means. The projected mean sea ice extent of a subset of models that most closely reproduce the climatological mean state and 1979–2012 trend of the Arctic sea ice is given (solid lines), with the minimum to maximum range of the subset indicated with shading. Black (grey shading) is the modelled historical evolution using historical reconstructed forcings. The CMIP5 multi-model mean is indicated with dashed lines. In the maps, the CMIP5 multi-model mean is given in white and the results for the subset in grey. Filled areas mark the averages over the 2081–2100 period, lines mark the sea ice extent averaged over the 1986–2005 period. The observed sea ice extent is given in pink as a time series and averaged over 1986–2005 as a pink line in the map. Further detail regarding the related Figures SPM.7b and SPM.8c is given in the TS Supplementary Material. {Figures 12.18, 12.29, 12.31}

---

[5] And even the low emission scenario projects a substantial amount of sea ice loss: RCP2.6 projects a 43 percent loss of September sea ice between 1986–2005 and 2081–2100 under the lowest, best-case emissions scenario. REF01497.

As the legend explains, for each of the four emissions scenarios (RCP 2.6, 4.5, 6.0, 8.5), the graphs on the left show (1) the mean sea ice projection across all the models in dashed lines, and (2) the mean from a subset of models that most closely simulates the 1979–2012 observed sea-ice trend in solid lines. REF01497. Similarly, in the maps on the right, the mean sea ice projection using all the models is shown in white, and the mean sea ice projection using the model subset that best simulates the observed sea ice trend is shown in gray. *Id.* The use of the models that best simulate observed sea ice loss is a way to reduce uncertainty in modeling future projections. *See, e.g.*, REF02494 (explaining the "support for weighting/recalibrating the models based on their present-day Arctic sea ice simulations"). Using the model subsets, September sea ice essentially disappears before or by the end of the century in three of the four emissions scenarios (RCP 4.5, 6.0, 8.5). REF01497 (Figure TS.17).

Plaintiffs make a similar error in suggesting the AR5 shows up to double the amount of sea ice remaining by the end of the century than that projected by the AR4. Pls.' Br. 35–36. Again, Plaintiffs rely on a graphic without the legend or appropriate context.

*State of Alaska, et al. v. NMFS*                                                                16
Case No. 3:22-cv-00249-JMK
Case 3:22-cv-00249-SLG     Document 29     Filed 07/21/23     Page 21 of 34



**Figure 7. -- Future Arctic sea-ice extent in September from individual runs of the six models used in this study, under the A1B emissions scenario. In the model runs with the fastest summer sea-ice loss, the Arctic is nearly sea-ice free by 2050. The heavy red line represents the observed record. The yellow line is the mean over all 23 IPCC models, showing an overestimation of ice extent in recent years. The blue line is the mean future trajectory of the selected six models that adequately reproduced the observed record, indicating increased climate sensitivity to greenhouse gases. Figure from Wang and Overland (2009).**

The legend for the figure, which is from the 2010 Status Review that NMFS relied on in its listing decision, explains that the yellow line on the graph shows the mean projection over all 23 IPCC models from the AR4, meaning the projected range for sea-extent is 0 to 4 million square-kilometers by the end of the century. REF00066 (Figure 7). This is similar to the range from the AR5 when using all of the models. *See supra* p. 15 (citing REF01497 (Figure TS.17)). When a subset of models that best simulates observed sea ice trends is used, the ranges of projected sea ice loss by the end of the century are also similar between the Status Review and the AR5: 0 to 2–2.5 million square-kilometers under the Status Review, REF00066 (Figure 7), and 0 to 2.5 million square-kilometers in the AR5 when including the low emissions RCP2.6 scenario (which NMFS determined was unlikely). REF01497 (Figure TS.17).

Plaintiffs' argument that NMFS failed to properly consider new information regarding snow fall also fails. Pls.' Br. 38. In denying Plaintiffs' petition, the agency explained that none of the information Plaintiffs presented dealt with projections of snow cover on *sea ice*. NMFS00174. Rather, Plaintiffs' cited studies all dealt with modeling snow cover on *land*, which NMFS explained cannot be used to infer future snow depths on sea ice. *Id.* And, as NMFS also reiterated, ringed seals have particular habitat needs and require a certain depth of snow on sea ice to dig birthing lairs. *Id.*; *see also* NMFS00033; REF00123–24. Without these snow caves, pups freeze to death or are eaten by predators. NMFS00172, NMFS00032; REF00123–24; *see also* NMFS00032 (noting studies finding a nearly 100 percent pup mortality rate when pups are born without snow caves). While "Plaintiffs may have less confidence than [NMFS] in the conclusions that the agency reached, that is not an appropriate basis for invalidating an agency's rational choice, particularly in matters requiring scientific or technical expertise." *In re Polar Bear*, 794 F. Supp. 2d 65, 96 (D.D.C. 2011), *aff'd* 709 F.3d 1 (D.C. Cir. 2013) (citation omitted).

B.   Plaintiffs' Arguments Misunderstand the Agency's Decision and the Relevant Legal Standard for Listing Decisions

Plaintiffs' remaining arguments are unavailing and misconstrue both the agency's decision and the relevant legal standard. Plaintiffs point to *Defenders of Wildlife v. Norton*, 258 F.3d 1136 (9th Cir. 2001), to claim NMFS's decision is arbitrary, arguing that the fact "a species' range has contracted, or … is projected to contract over the next 80 years, does not mean that the species is threatened with extinction." Pls.' Br. 34.

But Plaintiffs and others already raised this argument in their challenge to the bearded and ringed seal listings, and the Ninth Circuit rejected it both times. *Pritzker*, 840 F.3d at 683–84; *Ross*, 722 Fed. App'x at 668–69 (rejecting challenge to ringed seal listing for reasons stated in bearded seal listing case); Arctic Slope's Answering Br. at 43–44 (ECF No. 28), Alaska Oil and Gas Association's Answering Br. at 33 (ECF No. 30), State of Alaska's Answering Br. at 18 (ECF No. 34), *Ross*, 722 Fed. App'x 666(No. 16-35380) (filed Mar. 23, 2017) (raising the same argument in ringed seal briefing). It did so because "NMFS did not rely on habitat loss, alone, to justify its listing decision. Instead, the agency drew upon existing research to explain how habitat loss would likely endanger the bearded seal." *Pritzker*, 840 F.3d at 683. The same is true of NMFS's decision to list the ringed seal, as described above. *See supra* pp. 6–9. NMFS took the same approach in rejecting Plaintiffs' delisting petition: NMFS examined the allegedly new information not only for what it meant for future ringed seal habitat loss, but how that habitat loss would threaten the species' continued existence. *See, e.g.*, NMFS00175. The ESA does not require more.

Plaintiffs also claim that the AR5 says the climate models have "inherent unreliability." Pls.' Br. 35. Not so. The AR5 says that climate models have "inevitable uncertainties," which is a significant distinction. REF02442. Unreliability and uncertainty are not the same thing. Nor does the AR5 otherwise support Plaintiffs' claim that the climate models are "too uncertain" to rely on in listing decisions. Pls.' Br. 42.

It is axiomatic that "[t]he ESA does not require NMFS to make listing decisions only if underlying research is ironclad and absolute." *Pritzker*, 840 F.3d at 680. To the

contrary, the ESA's requirement that NMFS base listing decisions solely on the best available science means that "[e]ven if the available scientific and commercial data were quite inconclusive, [the agency] may—indeed must—still rely on it." *Sw. Ctr. for Biological Diversity v. Babbitt*, 215 F.3d 58, 60 (D.C. Cir. 2000).

The Ninth Circuit has held "that the IPCC climate models constitute[ ] the 'best available science'" on climate change. *Pritzker*, 840 F.3d at 679 (citations omitted). And it has also held that, while there is increased uncertainty in the models regarding the precise magnitude and timing of sea ice loss, "[t]he fact that climate projections for 2050 through 2100 may be volatile does not deprive those projections of value." *Id.* at 680. Moreover, in upholding NMFS's decision to list the ringed seal, the Ninth Circuit made clear that "[u]ncertainty regarding the speed and magnitude of" sea ice and snow cover loss "does not invalidate data presented in the administrative record that reasonably supports the conclusion that loss of habitat at key life stages will likely jeopardize the [Arctic ringed seal's] survival over the next 85 years." *Ross*, 722 Fed. App'x at 668 (second alteration in original) (quoting *Pritzker*, 840 F.3d at 683).

Nothing in the AR5 changes the wisdom of the Ninth Circuit's decision. Plaintiffs misunderstand the AR5 in suggesting the relevant science has become more uncertain since NMFS listed the ringed seal. As explained above, the AR5 plainly states that "the magnitude of the uncertainties *has not changed* significantly since AR4" and "[t]here is *overall consistency* between the projections" in the AR5 and that of the AR4. REF02436

(emphasis added).[6] And that is just what NMFS affirmed in rejecting Plaintiffs' delisting petition. *See, e.g.*, NMFS00173.

At bottom, Plaintiffs' complaints about NMFS's listing decision are ones of timing—Plaintiffs would prefer that NMFS strip ringed seals of their ESA protections until there is total certainty about when Arctic ringed seals will lose their sea ice habitat and the snow cover necessary for their survival. But that is fundamentally not the statutory standard. And the Ninth Circuit has already held that NMFS "need not wait" until an ice-dependent species' sea ice habitat is destroyed to conclude that the loss of that habitat will likely threaten the species with extinction. *Pritzker*, 840 F.3d at 683.

This is because the purpose of the ESA is "not only to protect the last remaining members of the [listed] species but to take steps to insure that species which are likely to be *threatened* with extinction never reach the state of being presently endangered." *Defs. of Wildlife v. Norton*, 258 F.3d at 1142 (quoting legislative history); *see also Alaska Oil & Gas Ass'n v. Jewell*, 815 F.3d 544, 555 (9th Cir. 2016) (the ESA "is concerned with protecting the future of the species, not merely the preservation of existing [animals]").

But deferring protection until some unstated point in the future when climate change and Arctic ringed seal population modeling are verified would be too late and

---

[6] The AR5 projects that September summer sea ice will be nearly non-existent before or by the end of the century under three of the four emission scenarios. *See* REF01497 (noting that September sea ice is projected to decline by 43 percent between 1986–2005 and 2081–2100 under the lowest, best-case emissions scenario (RCP2.6) and by 94 percent under the highest emissions scenario (RCP8.5)); *see also* NMFS00015 (noting projections of "[a] nearly sea ice free summer in the Arctic by mid-century"). The loss of sea ice during this time of year means that there will be no surface on which the snow needed for snow caves can accumulate. REF00012.

condemn the species to extinction. This is precisely what the ESA is meant to prevent.

*Defs. of Wildlife v. Norton*, 258 F.3d at 1142.

## II.     FWS's Analysis in the Walrus Listing Determination Does Not Undercut NMFS's Denial

Plaintiffs are wrong in alleging that NMFS's decision was unlawful because FWS has previously found long-term climate modeling too speculative to support ESA listings in its "not warranted" listing determination for the Pacific walrus. Pls.' Br. 29–31. Notwithstanding NMFS's finding that "the Pacific walrus has distinctly different life history and habitat characteristics as compared to the Arctic ringed seal," NMFS00173, and that the ESA mandates a species-specific approach to listing determinations, *see* 16 U.S.C. § 1533(a)(1), Plaintiffs mischaracterize both FWS's listing analysis for the Pacific walrus and the legal status of that determination. NMFS properly examined the information provided in Plaintiffs' petition and found no evidence to suggest delisting may be warranted.

First, FWS has *not*, as Plaintiffs suggest, found that modeling cannot predict sea-ice extent beyond 2060. Pls.' Br. 30. In the Pacific walrus determination, FWS relied on the climate projections contained in the AR5 and examined climate and sea ice projections out to 2100. 82 Fed. Reg. 46,618, 46,643–44 (Oct. 5, 2017) (Pacific walrus listing determination); *see also Ctr. for Biological Diversity v. Bernhardt*, No. 3:18-cv-00064-SLG, 2019 U.S. Dist. LEXIS 165439, at *25 (D. Alaska Sept. 26, 2019) (citing FWS's brief to note that "FWS does not dispute that the best available science on sea-ice loss allows FWS to foresee the threat out to 2100"), *rev'd on other grounds sub nom. Ctr.*

*for Biological Diversity v. Haaland*, 998 F.3d 1061 (9th Cir. 2021). But while it evaluated sea ice conditions until the end of the century, FWS considered 2060 to be the foreseeable future for how the walrus will respond to those conditions. 82 Fed. Reg. at 46,643–44. FWS bifurcated its analysis for the threat of sea ice loss and the species' response to that threat because the agency found that the walrus may be able to adapt to a changing climate. *Id.* (explaining that FWS had a high certainty that sea ice will decline dramatically by the end of the century but less certainty how the species will respond to those changes). Here, there is no "similar observed adaptability" in ringed seals; no evidence exists that ringed seals can adapt to ice- and snow-free conditions. NMFS00173–74.

Plaintiffs are mistaken in their allegation that FWS has found "that the models' projections of conditions at the end of the century cannot be used to establish that a species with a large population and extensive habitat will become endangered in the 'foreseeable future.'" Pls.' Br. 30–31 (citation omitted). They cite no support for this statement aside from their own petition (which only references the Pacific walrus determination). *See id.* n.5. FWS's reliance on the AR5 in examining climate and sea ice conditions to 2100 for the Pacific walrus ultimately supports NMFS's conclusion here that climate modeling is sufficiently reliable to predict long-term changes caused by climate change.[7]

---

[7] NMFS has previously used a foreseeable future of 2100 in listing climate-threatened species with currently robust populations. *See* 77 Fed. Reg. at 76,753 (ESA listing decision for the bearded seal, defining the foreseeable future for threats from sea ice loss

*State of Alaska, et al. v. NMFS*                                                                                          23
Case No. 3:22-cv-00249-JMK
Case 3:22-cv-00249-SLG     Document 29     Filed 07/21/23     Page 28 of 34

Furthermore, the Ninth Circuit struck down the Pacific walrus determination upon which Plaintiffs so heavily rely. In 2011, FWS found that the fate of the walrus is tied to Arctic sea ice and concluded that the substantial declines in sea ice projected by the end of the century requires protecting the species under the ESA. 76 Fed. Reg. 7634, 7648–49, 7674 (Feb. 10, 2011). FWS, however, did not list the walrus at the time. *Id.* at 7634. Instead, FWS found that listing the species was precluded by other higher listing priorities, placed it on the list of species awaiting ESA protection, and noted it would "develop a proposed rule to list the Pacific walrus as [the agency's] priorities allow." *Id*. Then, in 2017, while continuing to recognize that the walrus's sea ice habitat is disappearing in the face of climate change, FWS determined that the species might adapt to changing conditions and thus did not warrant ESA protection. 82 Fed. Reg. at 46,643–44. The Center challenged the decision and in 2021 the Ninth Circuit held FWS's "not warranted" determination arbitrary and capricious because FWS failed to provide adequate support for its change in position. *Ctr. for Biological Diversity v. Haaland*, 998 F.3d at 1070. The Court held, *inter alia*, that the agency failed to provide a rational explanation for why the scope of the foreseeable future changed from 2100 to 2060. *Id.*

In other words, nothing in FWS's Pacific walrus listing determination supports Plaintiffs' argument that "reasonable scientists disagree" such that "delisting of the ringed

---

as 2100); 79 Fed. Reg. 53,852, 53,886 (Sept. 10, 2014) (ESA listing decision for 20 corals, defining the foreseeable future for threats from climate change as 2100). It must continue to do so as long as the best available science supports this timeframe. *See San Luis & Delta-Mendota Water Auth.*, 747 F.3d at 602 (emphasizing that the ESA requires reliance on the best *available* science, not certainty).

seal may be warranted," Pls.' Br. 31 (citations omitted), particularly where the Ninth

Circuit has already held that decision unlawful.

None of the cases on which Plaintiffs rely dictate otherwise. *See* Pls.' Br. 31 n.106.

In *Buffalo Field Campaign v. Zinke*, the court found that FWS improperly "resolv[ed] an

outstanding scientific dispute" in making a 90-day finding on an ESA listing petition. 289

F. Supp. 3d 103, 111 (D.D.C. 2018). And in *Center for Biological Diversity v.

Kempthorne*, the court held the agency's decision unlawful because the record reflected

"disagreement among FWS scientists as to whether listing the [species] was ultimately

warranted," and also indicated agency staff "received 'marching orders' and were

directed to find an analysis that fit with a negative 90–day finding" on the listing petition

at issue. No. 07-0038-PHX-MHM, 2008 U.S. Dist. LEXIS 17517, at *36 (D. Ariz. Mar.

6, 2008). Here, NMFS did not resolve any scientific dispute in denying Plaintiffs'

petition, and Plaintiffs point to no evidence of disagreement among NMFS scientists or

any other evidence that delisting the ringed seal may be warranted.

Nor could they. The record here reflects that reasonable scientists *agree* that long

term climate modeling shows dramatic and catastrophic sea ice loss through at least 2100.

*See Pritzker*, 840 F.3d at 679–80. ("There is no debate that temperatures will continue to

increase over the remainder of the century and that the effects will be particularly acute in

the Arctic. The current scientific consensus is that Arctic sea ice will continue to recede

through 2100."). In responding to Plaintiffs' petition, NMFS properly explained why the

FWS's Pacific walrus determination does not show that delisting the ringed seal may be

warranted. *See* NMFS00173.

### III. NMFS Properly Evaluated the Biological Information Provided in the Petition

Plaintiffs briefly, and without support, allege that NMFS failed to credit the biological information provided in their petition regarding the current size of the ringed seal population. Pls.' Br. 38–40. But an examination of both the petition and NMFS's response belies that contention. And Plaintiffs' arguments are fundamentally inconsistent with the Ninth Circuit's holding that (1) NMFS need not wait until it has "quantitative data reflecting the species' decline" before listing a species, and (2) NMFS's decision to list the Arctic ringed seal was reasonable in light of the projected loss of its habitat over the next 85 years. *Ross*, 722 Fed. App'x at 668.

Plaintiffs do not identify any particular studies that NMFS failed to evaluate or otherwise explain how NMFS's response is inadequate. Instead, Plaintiffs generally allege that because "the species' population continues to number in the millions despite rapid sea-loss [sic]," ringed seals must have greater resilience that previously known. Pls.' Br. 34. They assert that NMFS "disregarded this new data and failed to explain how it did not undercut its analysis that" the species is threatened with extinction. *Id.* But NMFS's response is replete with explanations for why the studies cited in Plaintiffs' petition do not constitute new information that would support a conclusion that delisting the Arctic ringed seal may be warranted. NMFS 00173–78.

For example, Plaintiffs assert that declines in sea-ice extent with no corresponding declines in the ringed seal population size contradicts assumptions made in the listing decision, NMFS00094, but NMFS explained that "listing of Arctic ringed seals as

threatened was not based on evidence indicating that population size or health had declined, nor was it based on a presumption that a climate driven decline would be detectable at that time or shortly thereafter," NMFS00175. Rather, NMFS based its listing decision on the decreased pup survival and population declines expected within the foreseeable future (i.e., by 2100) due to the loss of sea ice. *Id.* In addition, NMFS noted that "the 'observed habitat declines' discussed in the petition do not represent the magnitude of anticipated 21st century warming, loss of sea ice, and reduced on-ice snow depths that were the primary concern in listing the Arctic ringed seal." NMFS00176.

NMFS also responded to claims that data collected from the Alaska Native subsistence harvest show ringed seals have not exhibited declines in body condition or other parameters, with the agency explaining that it evaluated similar data from the same harvest monitoring program when listing the species:

> [H]ealthy individual animals are not inconsistent with a population facing threats that would cause it to become in danger of extinction in the foreseeable future. In the case of ringed seals, substantial losses due to predation and hypothermia associated with reduced snow cover could not be detected by assessing the health of survivors. In fact, survivors might be expected to fare well for a period of time as a consequence of reduced competition.

*Id*. (citation omitted). NMFS also highlighted that while the study showed growth of ringed seals increased as the area of sea ice decreased, "this trend began to reverse as the area of sea ice approached zero." *Id*.

NMFS similarly evaluated other studies cited in the petition and gave detailed explanations for why they "do not constitute new information or new analysis that is inconsistent with the analysis in the final listing rule." NMFS00175; *see*, *e.g.*,

NMFS00176 (explaining why Plaintiffs' assertions regarding pup survival rates in current ice and snow conditions did not constitute new information or analysis). The anecdotal observations in the petition suggesting ringed seals are able to give birth directly on sea ice, without a snow cave, fail to include supporting documentation as required by regulation, 50 C.F.R. § 424.14(c)(5)–(6), and "do[ ] not present information regarding the survival of any such pups." NMFS00176. In short, there is no evidence in the scientific literature that demonstrates resilience of the ringed seal population in the face of dramatic loss of sea ice and snow cover, as alleged in the petition. NMFS00093–95.

The best scientific information available continues to demonstrate that ringed seals are likely to become endangered in the foreseeable future as a result of dramatic reductions of sea ice and on-ice snow depths. NMFS 00175–76; *Ross*, 722 Fed. App'x at 668 ("The Arctic ringed seal is 'more likely than not' to become endangered in the foreseeable future" (citation omitted)). In its 90-day finding, NMFS recognized that the correct inquiry is not whether the ringed seal population is currently robust but how the population will fare in the foreseeable future. NMFS00174–76. The agency properly denied Plaintiffs' petition because it did not provide any new information regarding the resiliency of ringed seals in the face of widespread and catastrophic habitat loss. *Id*.

## **CONCLUSION**

For all the foregoing reasons, Defendant-Intervenor respectfully requests that the Court uphold NMFS's 90-day finding.

*State of Alaska, et al. v. NMFS*                                                                28
Case No. 3:22-cv-00249-JMK
Case 3:22-cv-00249-SLG     Document 29     Filed 07/21/23     Page 33 of 34

Respectfully submitted this 21st day of July, 2023,

/s/ *Kristen Monsell*
Kristen Monsell (*admitted pro hac vice*)

/s/ *Emily Jeffers*
Emily Jeffers (*admitted pro hac vice*)

CENTER FOR BIOLOGICAL DIVERSITY
1212 Broadway, Ste. 800
Oakland, CA 94605
Phone: (510) 844-7137
Facsimile: (510) 844- 7150
Email: kmonsell@biologicaldiversity.org
ejeffers@biologicaldiversity.org

*Attorneys for Defendant-Intervenor*
*Center for Biological Diversity*

## CERTIFICATE OF COMPLIANCE WITH WORD LIMITS

I certify that this document contains 7,414 words, excluding items exempted by Local Civil Rule 7.4(a)(4), and complies with the word limits of Local Civil Rule 7.4(a)(1).

/s/ *Kristen Monsell*
Kristen Monsell